Goodbar & Company v. N. Bloom et ux.

Decided June 13, 1906.

**1.—Conditional Sale—Mortgage—Distinction.**

In determining whether a conveyance absolute on its face, with a written agreement to reconvey signed by the grantee, is a mortgage or a conditional sale, reference will be had to the enquiry whether the relation of creditor and debtor continues to exist. If it does, it is a mortgage; if it does not, it is a conditional sale. In order to establish that a deed absolute on its face is a mortgage, this fact must be proved with clearness and certainty; and the same rule applies to an instrument which clearly shows upon its face to be a conditional sale.

**2.—Same.**

Where the defendant was indebted to the plaintiff, and executed to him an absolute deed for a house and lot, reciting therein a consideration of $1,000 in hand paid, and at the same time executed his note to the plaintiff for the balance of such indebtedness, and the plaintiff at the same time gave to the defendant an instrument in writing, styled "Refusal Memorandum," in which it was stipulated that the defendant should have the right to purchase the same premises at any time prior to a certain date named for the same amount of money, with interest, and the payment of said note, the trial court correctly held, in the light of the antecedent facts and the subsequent construction placed by the parties on said instruments, that the transaction was a conditional sale and not a mortgage.

**3.—Same—Intention of Parties—Question of Fact.**

Whether or not a deed was intended by the parties as an absolute conveyance, or as a mortgage, is ordinarily a question of fact to be decided from all the evidence pertinent to it. The only safe criterion is the intention of the parties, to be ascertained by considering their situation and the surrounding facts, as well as the written memorials of the transaction. The character of the transaction is fixed at the inception of it and what the intention of the parties make it.

Appeal from the District Court of Leon County. Tried below before Hon. Gordon Boone.

*Jno. A. Newsom* and *Gregg & Brown,* for appellant.—When a debtor executes a deed absolute on its face to his creditor and receives from his creditor an obligation, by the terms of which the creditor obligates himself to reconvey the land upon payment of the debt the transaction is simply to secure the debt and the deed will be declared a mortgage. Moore v. Wills, 69 Texas, 111; Loving v. Milliken, 59 Texas, 425; Brooks v. Young, 60 Texas, 35; Ragland v. Wisrock, 61 Texas, 395.

When parties have embodied the terms of their agreement in writing neither can give oral evidence that they did not mean that, which the writing when properly read, expresses or legally implies, or that they meant something inconsistent therewith. Milliken v. Callahan, 69 Texas, 205; Lott v. Kaiser, 61 Texas, 668; Heffron v. Cunningham, 76 Texas, 319.

*Watson & Dashiel,* for appellee.—Where a deed absolute on its face is given in consideration of the extinguishment of a pre-existing debt, it is an absolute deed and not a mortgage.

An agreement to reconvey executed by the grantee in a deed absolute upon its face constitutes the transaction a conditional sale. Miller v. Yturria, 7 S. W. Rep., 206; Focke v. Buchanan, 59 S. W. Rep., 820; Kirby v. National Loan & Investment Co., 54 S. W. Rep., 1001.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by Goodbar & Company, a corporation incorporated under the laws of Tennessee, against the appellees, Nathan Bloom and his wife, Theresa, to recover an alleged debt of $1,006.73 claimed by appellant to be due it from appellees, and to reform a certain instrument, in the form of a deed but averred by appellant to be a mortgage made by appellees to secure such indebtedness, by including therein two other lots, which appellant claims were agreed by the parties to be included but were omitted from said instrument either by mistake or fraud of the appellees, and, when so reformed to have such instrument declared a mortgage, and, as such, foreclosed and sold to satisfy the debt sued for.

The appellees answered by a general denial, and plead specially that the instrument averred by appellant to be a mortgage was, as it purported on its face to be, an absolute deed of conveyance made by appellees to appellant in consideration of the cancellation of the alleged debt sued on, and it was so intended and understood by the parties and accepted by appellant with full knowledge of its contents, and that the two lots sought to be included by its reformation were not intended to be embraced in such instrument.

The case was tried by the court without a jury and judgment rendered that the plaintiff Goodbar & Company take nothing by its suit and that defendants Nathan Bloom and wife, Theresa, go hence without day and recover of the plaintiff and sureties on his cost bond all costs of suit.

The facts in this case are shown by evidence which is undisputed and are substantially as follows: On October the 5th, 1903, the appellee, N. Bloom of Buffalo, Texas, being indebted to appellant, a commercial corporation of Memphis, Tennessee, wrote it a letter in which he said: "I have a good hotel comprising five lots, all necessary barns, cisterns, servants' houses, etc., well situated to the depot, and, in fact, from every point of view, a desirable location. This piece of property brings me $25 per month which amounts to $300 per year. I will take for this property $2,000, which is very cheap. The rent would pay you over 10 percent on your money invested, as repairs are not necessary to any great extent. I owe you, and this is the only way that I can see to pay you. My resources are sufficient to meet my liabilities, provided I can collect, but this is utterly impossible as there is nothing made to pay with. You can not understand how serious the outlook is, and I am well aware that you think collections should amount to something. If you can handle this piece of property I can pay you, but if not I am wholly unprepared to make you any proposition." Again, on October 19, 1903, he wrote a letter to appellant in which, after stating his inability to raise money on account of failure of crops, he said: "Now to the point. I have received word from Sanger Bros., to whom I owe $1,403, that they are willing to carry me over, provided I will pay as much as I can, and take only my personal note payable in 1904. They are my largest creditor, excepting you, that is for goods. I pledge you that I will give no man a deed of trust during the year of 1903 to 1904. I am going to do by one and all the same, and make no distinction. I intend to pay you all I can, and all in the same proportion except my little creditors, and I think—and also your Mr. King, that it is best to pay them, so that their mouths will be stopped as they are all more or less restless.

"Now gentlemen I wish your voice on this subject at your earliest opportunity so that we will come to some understanding at an early date. I wish to allay suspense."

The appellant, in reply, on November 3, 1903, wrote Bloom expressing surprise at his not being willing to mortgage his property for the benefit of his creditors, and reminded him that his statement to the Mercantile Agencies included 800 acres of land in his wife's name, was, in part, the basis of his credit, and suggested that it should now be made the basis of security for his debts. In reference to the hotel property, the letter is as follows: "We do not want the hotel property and would not give you $1,000 for it, but we will agree to extend your debt, if you will give us a mortgage on that piece of property. This would put you in no worse light with your other creditors than to sell to us."

Again, on November 10, 1903, appellant wrote Bloom as follows: "Replying to your recent letter in regard to selling us your hotel property, we have to say that we do not want it at any price, because our experience has been that property of similar character has always proved a loss to us. We will, however, make you this proposition: You make us a deed to the property at a consideration of $1,000, and we will carry

you until next fall for the balance of the debt. The deed can go on record, and outside of that record we will give you an obligation that we re-deed to you the property next fall, after you have paid us the balance of the $737 and interest and paid us the $1,000. This we know would simply make it equivalent to a mortgage, but to the outside world, or in other words, to every body except you and us, it would have the appearance of being a bona fide sale.

"If you decline to do this, then we must insist upon your executing a mortgage trust deed upon your 640 acres of land, the hotel property and all other real estate you have, except your homestead, for the benefit of all your creditors. . . . We believe, and have been so advised, that your creditors could hold that real estate as community property, but we do not wish to test that matter by going into the courts, and simply ask you to do what we believe to be fair, just and right with us and your creditors. We do not believe that we could sell the hotel property for over $1,000, which is the reason that we are unwilling to take it at any more than that and then carry the balance of your debt.

"We will also make you another proposition: If you will raise enough to pay us the $737, we will take the hotel property at $1,200, and clean up the entire indebtedness at once."

On November 16, 1903, Bloom wrote the appellant, after some introductory observations, as follows: "I wish to satisfy you, as you have been rather kind to me during this year, therefore I will comply with your letter of the 10th.

"I will have my attorney make out deed to hotel property, and you may send me note for balance, and as soon as you get the deed fixed up you can forward me the obligation, which will grant me the option of redeeming the aforesaid property.

"It is not my desire to ask one and one-half times the value of my land, but since you asked to buy some of it, I simply give you a price.

"I do not wish to be contrary, neither do I wish to be dishonest, but I do not wish to give a trust deed to my property.

"I kindly ask that you make note payable November 1, as that will give me time within which to meet this obligation. Include interest in face of note."

On November 21, 1903, Goodbar & Company wrote to Bloom a letter in reply, which is as follows: "We are in receipt of your letter of the 16th inst. and note your acceptance of our proposition of settlement of your account with us, to give us a deed to the hotel property in question for $1,000 and execute your note payable October 1, 1904, for the balance. In compliance therewith we have this day prepared a statement of your account, together with note due at the above stated time for your signature and sent the same of Mr. Jno. A. Newsom of your town to pass on the title to the property and receive the settlement for us. You will also please deliver to Mr. Newsom the rent notes that you have been carrying thereon.

"We have requested Mr. Newsom to draw up an agreement for our signature giving you an option to re-purchase the property for the same consideration you will convey it to us, upon the prompt payment of the note you are to give us as above stated, and 8 percent interest on the $1,000 from date until paid by November 1, 1904. If we collect rents

in excess of the amount of taxes, insurance and interest on the property, we will refund the same to you. We do not know whether or not Mr. Newsom is your attorney, but he is very highly recommended to us and we have confidence in him to refer the same to him for settlement. We trust you will call to see Mr. Newsom at once and arrange the settlement for we desire to close the same definitely at an early date."

On the same date appellant wrote John A. Newsom, an attorney at law, as follows: "In regard to N. Bloom and his indebtedness to us, we have just arrived at the following settlement with him:

"He has agreed to give us a deed to the hotel property in question for and in consideration of $1,000 and to execute his note due October 1, 1904, for the balance due on his account. With that end in view we hand you a statement of his account to us, together with note for his signature for $800 which please have him to execute in taking a deed to the property. We want you to thoroughly look into the title to the property and if you approve of it, it will be acceptable to us. You will also secure from Bloom the rent notes he has for the property, and have him transfer to us the insurance that he has been carrying thereon.

"In regard to the maturity of the note that he is to give us he is now asking that we make it November 1, but our original proposition was to make it payable October 1, and please govern yourself accordingly. We have agreed with him to convey the property back to him for the same consideration that he has delivered it to us, upon the prompt payment of his note due October 1, 1904, which he is to execute, as above stated, together with 8 percent interest on the $1,000 from date until paid by November 1, 1904. It is also agreed that if we collect rents in excess of the taxes, insurance and interest on the property, we' will refund the same to him. We were advised by Mr. Bloom on October 5, last that he had a $25 monthly income from the property and we presume he is deriving the same from it at this time.

"Please draw us an agreement, giving him such option on the property which we will promptly execute upon the receipt of deed and his note. We are anxious to get this matter definitely settled at an early date and please call to see him at once and push it vigorously to a settlement. ·For your information, we enclose herewith a copy of the letter we have this day written him."

On November 23, 1903, Mr. Newsom, in reply wrote appellant, in substance, that he had had an interview with Mr. Bloom in regard to the matter of settlement and that they were together except on one point, that is, Bloom wanted the note payable November 1, 1904, instead of October 1, as directed; that he (Newsom) had suggested as a compromise that the note be made payable on October 15, and that after considerable begging, Bloom had assented to it; that he had prepared the deed, which he expected Bloom's wife to sign, which he sent appellant for inspection before signing; that Bloom had informed him that the insurance he was carrying on the hotel building had just expired, and that he had not taken rent notes from his present tenant, and that he had rented the property for $25 per month, but had to reduce it to $15, and that he (Bloom) was willing the tenant pay the $15 rent per month when due to him (Newsom) to be sent to appellant, or to collect it and send it him-

self. Newsome closed the letter by asking appellant to advise him as to such matters.

On November 27, 1903, in reply to Newsom's letter appellant wrote him as follows: "We are just in receipt of your letter of the 23d inst. with enclosure of deed to be executed by Nathan Bloom and wife, both of which are carefully noted. You did not make the deed in our favor as a corporation so we have taken the liberty to add the same therein, and with this exception we are willing to accept the deed on your judgment as stated in your letter.

"In regard to the rental of the property and its collection, we think it advisable to let Mr. Bloom continue to look after the same, for it will make him more friendly towards us in this transaction and will keep him in touch with the property. Please say to Mr. Bloom, however, that any contract he makes for the rent of the property, must not extend beyond November 1, 1904, at which time his option to re-purchase it will expire by limitation.

"We note that the insurance has expired on the hotel and you will please take steps to insure it for $1,000 for a period of twelve months and kindly send the policy to us and we will reimburse you. In regard to the maturity of the note, we see that he contended for November 1, but that you compromised the matter by making it mature October 15, which is satisfactory.

"We trust that you will be able to get this matter definitely closed at an early date and awaiting your attention, we are,

Yours truly,<br>Goodbar & Co., Incorporated.<br>By W. E. Stansbury.

"Please also look into the taxes for this year—we feel that Mr. Bloom should settle them as the year is so far advanced. Also charge interest on note to October 15, 1904."

The negotiations between the parties culminated on the first day of December, 1903, by Bloom and his wife executing and delivering to Goodbar & Company their general warranty deed, which expresses a consideration of one thousand dollars in hand paid by appellant to appellees, to lots numbers eight, nine and ten in block number twenty-seven of the town of Buffalo in Leon County, Texas, according to map and plat of town, as it appears of record in deed records of Leon County, book "O," page 487; the execution and delivery by N. Bloom to appellant of his promissory note for $802.08 (the remainder of his indebtedness to Goodbar & Company after deducting the $1,000, expressed as the consideration of said deed) payable on October 15, 1904, with interest thereon at the rate of 8 percent from maturity; and the execution on December 3, 1903, by Goodbar & Company to the appellee N. Bloom an agreement in writing, drawn at the same time the deed was by Mr. Newsom, which is as follows:

"REFUSAL MEMORANDUM.

"Between Goodbar & Company, a corporation, incorporated under the laws of Tennessee and doing business in the city of Memphis in said

State, acting by J. M. Goodbar, its president, duly authorized to act in this capacity, and, Nathan Bloom of Buffalo, Leon County, Texas.

"In consideration of the sum of ten dollars to it in hand paid, the receipt of which is hereby acknowledged and for other valuable consideration had and received, it, the said Goodbar & Company (Inc.), does hereby agree to and with said Nathan Bloom, that he shall have the right to purchase from it at any time between this day and date and the 1st of November, A. D. 1904, the following described premises, now belonging to it, with the appurtenances thereto belonging, which premises are described as follows, to wit:

"Lots numbers (8) eight, (9) nine, and (10) ten, in block No. (27) twenty-seven of the town of Buffalo, Leon County, Texas, according to the map and plat of said town as it appears of record in the deed records of Leon County, book "O," page 487, on the following terms, to wit:

"One thousand dollars cash, with interest thereon, from this date at the rate of 8 percent per annum until the said first day of November, A. D. 1904, and upon the further condition that the said N. Bloom shall have paid off and discharged a certain note by him executed and delivered to this company dated December 1, 1903, due October 15, 1904, with interest thereon at the rate of 8 percent from maturity, for the sum of (802.28) eight hundred two and 28-100 dollars. And on notice of his election so to purchase, given to it in writing, by letter mailed to it at Memphis, Tennessee, or served on it personally, it does here agree and bind its assigns and successors to make full, complete and perfect title by, through or under it to said Nathan Bloom his heirs or assigns, and to perfect such title to or under it, and to re-convey to said Nathan Bloom, his heirs or assigns upon his complying with the terms and conditions above set forth and expressed.

"It is understood and agreed that all rents and revenues, collected by this company from this property, in excess of taxes, insurance, interest. etc., the same to be repaid to the said N. Bloom upon his purchasing said property."

A month or two after the execution of these instruments Mr. Newsom took out two fire insurance policies of $500 each on the property, payable to Goodbar & Company, as the absolute owner thereof. After the papers were executed, Bloom, in pursuance of the arrangement made with him at the time, collected for appellant the monthly rent of the property and remitted proceeds to Goodbar & Company until October the 12th, 1904, when he wrote the appellant as follows: "I have by this mail forwarded to Memphis Trust Company draft for amount of $802.28 to cover note given in 1903.

"Relative to the conditional sale of the hotel I would say that I do not care to redeem the hotel as money matters are cramped at present. If you have my note for $1,000, I, of course, would pay it; but since you bargained for the hotel, I had rather it remain as it is now than to go to the trouble to raise $1,000. I am of opinion that you can find a purchaser for this property as it is worth that amount even to-day, though I am not able to pay such a price. In regard to the rent you may get some one to attend to that matter in the future, as I would rather you get some one else. I am sorry that I can not take it off your hands, but there is no chance for me to have the deed made different, therefore

you can destroy the agreement." As stated in this letter, the draft was sent to the Memphis Trust Company, who held the note, in payment and discharge of the indebtedness evidenced by it, and the note, upon receipt of draft, sent back to Bloom. In reply to the above letter, on the 15th of October, 1904, the appellant wrote Bloom as follows: "We are in receipt of your letter of the 12th inst., and note that you have remitted to the Memphis Trust Company in payment of your note which became due this date, which is appreciated.

"We also observe that you do not desire to redeem the hotel property under our agreement with you and shall govern ourselves accordingly. As we understand it, you have rented the property monthly to the tenant now in charge for the consideration of $15 per month. Please give us the name of the parties so that we may correspond with them directly concerning the matter. Thanking you for your courtesy and wishing you much success, we remain, etc."

Mrs. Fannie Stocker was the party who had rented and was occupying the hotel at that time; and, November 1, 1904, the appellant wrote her as follows: "Dear Madam: Please remit to us the monthly rental for the use of the Bloom hotel, as we are now the owners of it. Your prompt attention will be much appreciated."

Bloom, who was a witness in the case, was asked on the trial: "And at the time you made that deed, how about cancelling the $1,000 debt? Did you intend to put up any security for $1,000, or did you intend to pay $1,000?" He answered: "I intended to pay $1,000, which I did, and if I didn't intend to pay it I wouldn't have given a note for $802.20 to cover my indebtedness."

There was no testimony of any officer or agent of appellant upon the issue as to whether the instrument was intended as an absolute deed or a mortgage.

We have stated practically all the testimony bearing upon the question whether the deed to the hotel property was intended by the parties as a conveyance of the title or as a mortgage. This, we take to be a question of fact, ordinarily to be decided by the jury from all the evidence pertinent to it. And, like any other issue whose province is within the domain of the jury, when decided, either by the jury or the court sitting as a jury, such determination of it will not be disturbed upon appeal unless the evidence upon the issue is such that no reasonable mind can reach the same conclusion attained by the jury.

It is true that there are certain principles of law applicable to the issue which must guide the jury in considering the evidence upon which the issue is to be determined. But they are rules of construction rather than principles of substantive law which arises from and attaches to a given state of facts. These principles will be stated, as enunciated in the elementary authorities, pronounced and applied in courts of last resort in other States as well as those of our own. When stated, we shall then apply them to the evidence before us, and, in view of them, determine from it whether any ordinary mind could reach any other conclusion than that found by the trial judge upon the question. If not, then our finding upon the issue of deed or mortgage will simply be an adoption of that of the trial judge.

To determine whether a particular transaction amounts to a mortgage

or to a sale with a contract to repurchase, Mr. Pomeroy states the rule thus: "The criterion is the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of the existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instrument. On the contrary, if no such relation whatsoever of debtor and creditor is left subsisting, then the transaction is not a mortgage, but a mere sale and contract of repurchase." (3 Pom. Eq., sec. 1195.)

Mr. Jones thus states the criterion for determining the question: "Whether a conveyance be a mortgage or a conditional sale must be determined by a consideration of the particular circumstances of each case. 'A glance at the numerous adjudications in controversies of this kind will suffice to show that each must be decided in view of the particular circumstances which belong to and mark its character, and that the only safe criterion is the intention of the parties, to be ascertained by considering their situation and the surrounding facts, as well as the written memorials of the transaction.' The intention of the parties is the only true and infallible test, and this intention is to be gathered from the circumstances attending the transaction and the conduct of the parties as well as from the face of the written contract." (Jones on Mort., sec. 258.)

Again, the same author says: "The character of the transaction is fixed at the inception of it, and what the intention of the parties makes it. The form of the transaction and the circumstances attending it are the means of finding out the intention. If it is a mortgage in the beginning, it remains so; and if it was a conditional sale at the start, no lapse of time will make a mortgage of it. .. . . If not a security in the beginning, but an absolute sale or a conditional sale, no subsequent event, short of a new agreement between the parties, can convert it into a mortgage. Where an instrument contains the exact terms agreed on by the parties, and expresses their intent and meaning, the fact that they thought it a mortgage, while it was in fact a conditional sale, does not change its character or effect."

"The existence of a debt is the test. If an absolute conveyance be made and accepted in payment of an existing debt, and not merely as security for it, an agreement by the grantee to reconvey the land to the grantor upon receiving a certain sum within a certain time does not create a mortgage, but a conditional sale, and the grantee holds the premises subject only to the right of the grantor to demand a reconveyance according to the terms of the agreement. A debt either pre-existing or created at the time, or contracted to be created, is an essential requisite of a mortgage. An absolute deed delivered in payment of a debt is not converted into a mortgage merely because the grantee therein gives a

contemporaneous stipulation binding him to reconvey, on being reimbursed within an agreed period, an amount equal to the debt and interest thereon. If the conveyance extinguishes the debt, and the parties so intended, so that a plea of payment would bar an action thereon, the transaction will be held an absolute or conditional sale notwithstanding. And so if there was in fact a sale, an agreement by the purchaser to resell the property within a limited time, at the same price, does not convert it into a mortgage. . . . But if the indebtedness be not cancelled, equity will regard the conveyance as a mortgage, whether the grantee so regards it or not. He can not at the same time hold the land absolutely and retain the right to enforce payment of the debt on account of which the conveyance is made. The test, therefore, in cases of this sort, by which to determine whether the conveyance is a sale or a mortgage, is found in the question whether the debt is discharged or not by the conveyance. If in the subsequent transaction of the parties there is no recognition in any way of the relation of debtor and creditor, and the vendee for a considerable period holds possession without paying interest or rent, these facts go to show that there is only an agreement for purchase and not a mortgage." (Jones on Mort., secs. 263, 265, 267.)

For cases from other States illustrative of the application of the principle, that a conveyance absolute in form is not *converted into a mortgage* by a contemporaneous agreement for a resale and purchase, where is was not shown the parties intended to give it that effect, see Hays v. Emerson (Ark.), 87 S. W. Rep., 1027; Gerhard v. Tucker (Mo.), 85 S. W. Rep., 552; Gassert v. Bogk, 1 Law Rep. Ann., 240, and note.

There are many other cases to the same effect but we deem the citation of these, together with those cited in text books quoted from, sufficient to illustrate the principle.

We will turn now to some of the cases from our own courts, which will be found to be in perfect accord with the elementary authorities upon the subject under consideration.

In Alstin v. Cundiff, 52 Texas, 453, it is held "that in determining whether a conveyance absolute on its face, with a written agreement to repurchase signed by the parties, is a mortgage or a conditional sale, reference must be had to the inquiry, whether the relation of creditor and debtor continues to exist. If it does, it is a mortgage; otherwise, a conditional sale. This test is adhered to in Miller v. Yturria, 69 Texas, 549, where after saying that a conveyance, however, which purports to be a sale either absolute or conditional, may be shown to be a mortgage by proving it was intended merely as a security for a debt, it is held that, in order to establish that an absolute deed is intended as a mortgage, it must be proved with clearness and certainty, and that the same rule applies to an instrument which clearly shows upon its face a conditional sale. We will here observe, that this rule as to the character of proof has been enunciated with the same if not greater, emphasis in other jurisdictions. (Hays v. Emerson, 87 S. W. Rep., 1027; Gerhard v. Tucker, 85 S. W. Rep., 552.)

The case of Kirby v. National Loan & Inv., Co., 54 S. W. Rep., 1081, 22 Texas Civ. App., 257, is very similar in its facts to the one at bar. In that case Kirby was indebted to the National Loan & Investment

Company in the sum of $1,500 evidenced by a note which was a lien upon a certain piece of land owned by Kirby. In order to settle said indebtedness Kirby and wife made a deed to the land to the company, in which such indebtedness was recited, reciting as a consideration the discharge of said debt and the payment of $100 cash. The deed of conveyance then recites, "it is the purpose and intention of this instrument to make an absolute and unqualified conveyance of said property and to vest in grantee free, clear and unencumbered title thereto, having no other or further condition attached thereto except the following right to repurchase said property upon the following terms, to wit: The said grantee herein in accepting this instrument gives to the grantors herein, and the grantors herein expressly reserve the right to repurchase said property from said National Loan & Investment Company, its assigns and successors, at any time within three years from this date, at the agreed price of $1,550 cash, conditioned, however, that whereas said grantors have this day leased from grantee, the National Loan & Investment Company of Detroit, Mich., the aforesaid premises for a period of three years at an annual rental of $93, payable semiannually, as evidenced by the notes of said grantors herein, being five in number, four each for the sum of $46.50, due and payable to the order of the National Loan & Investment Company of Detroit, Mich., and due as follows: One on August 1, 1895, one on February 1, 1896, one due on August 1, 1896, one due February 1, 1897, one due August 1, 1897, and on for $93 due February 1, 1898. Now, therefore, if said A. H. Kirby and Alma Kirby shall fail or refuse to pay any one of said notes for a longer period than six months after its maturity (time being the essence of this agreement), then and in that event the option to repurchase this property shall be, and is, forfeited by said A. H. and Alma Kirby; and it is understood that said last maturing note shall also be paid at the expiration of said three years in the event said A. H. and Alma Kirby purchase said property under their right to repurchase herein contained. The said A. H. and Alma Kirby, as a further condition of leasing this property and of their right to repurchase, obligate and bind themselves to keep said property insured for a sum not less than $1,550 at their own cost and expense, making the policy payable to the National Loan & Investment Company as their interests may appear, and further to annually pay the taxes assessed against said property; and a failure to keep said property so insured, or in the event they fail to pay said taxes due thereon as the law requires, then their right to repurchase said property shall and does expire, and is by them forfeited. In the event of a failure to pay any of said notes or taxes, or to keep in force said insurance, as above set forth, within the time set forth, said A. H. Kirby and Alma Kirby agree and concede that their right to repurchase is forfeited, and they agree and consent to surrender immediate possession, peaceably and quietly, to said National Loan & Investment Company; and they further agree to pay to said company for the time they have so occupied said premises the rents due at the time they surrendered possession to said loan company, at the annual rate stated. In the event of the forfeiture of the rights of said A. H. and Alma Kirby to repurchase as hereinbefore stated, or in the event of their failure to pay said purchase price as hereinbefore state, within three years from this date, then the

National Loan & Investment Company shall be, and by these presents are, vested with clear and unincumbered title, being free to own, hold, or in any manner dispose of said property; it being in that event the property of the said National Loan & Investment Company of Detroit, Michigan, free from any right, title, claim, or interest therein or thereto in said A. H. and Alma Kirby. In testimony whereof, witness our hands this the 1st day of February, 1895.   A. H. Kirby, Alma Kirby."

It was insisted by the appellant that this instrument upon its face purported to be a mortgage, and not a deed. Upon this insistence it was observed by the court that the intent and purpose of the parties manifested by the instrument to pass title *in praesenti*, subject to the reserved right to repurchase upon the terms named was clear.   "The intent and purpose in the execution of an instrument, by all authorities, are of controlling influence in its construction. Every canon of construction has for its object the ascertainment of this intent. It is true, the written expression thereof is not conclusive. The situation of the parties, the attendant circumstances, as well as written memorials may be considered. But when thus ascertained, effect must be given thereto, when not unlawful or opposed to public policy. In determining the effect of the instrument as written, however, we can consider such extraneous facts only as appear therein. Its effect as written is a question of law, to be solved in the first instance by the court. If parol evidence must be resorted to in order to explain the terms or intention of the parties, then the question of construction ceases to be one of law merely, and becomes one of mixed law and fact, to be determined by the jury under appropriate instructions. As we read the instrument before us, no fact is recited that is sufficient to nullify or modify the expressed intent and purpose. The fact that there was a pre-existing debt is insufficient. In such case the question is, was the old debt surrendered or cancelled at the time of the conveyance? To constitute a mortgage, the relation of debtor and creditor must continue to exist. The instrument before us recites, as one of the purposes of its execution, the discharge of such indebtedness, and the consideration therefor, in part, was its cancellation. It may be, as insisted, that the instrument contains a clause of defeasance, within the definition thereof; . . . but if so, it is evident that the clause here under consideration is not of the character that abrogates, rescinds, or gives reverse or non-effect to the title conveyed. It in effect provides that in a given contingency the title and right conveyed may be reacquired by the grantor. If such provision must fix the character of the instrument as a mortgage, then it is evident that no such instrument as a conditional sale can be framed. Such provision is a necessary concomitant of such a sale, and in no view can be construed as inconsistent therewith. Such, we think, must be the conclusion as to each other circumstance relied upon appearing on the face of the instrument before us. When analyzed, we think, without further discussion, that none of the provisions or recitals of the instrument under consideration are inconsistent with the express purpose to constitute an absolute conveyance of title in present, and that therefore, the court correctly refused to construe it as a mortgage." For cases of similar character see Focke v. Buchanan, 59 S. W. Rep., 820; Pumilia v. De George, 74 S. W. Rep., 814.

We will now apply these principles of law to the facts for the purpose of determining whether the evidence is sufficient, in view of the law, to warrant the ultimate conclusion of fact reached by the trial judge that the conveyance of the hotel property by appellees to appellant was an absolute sale conditioned upon the right of appellee to repurchase the property within the time and upon the terms specified in the instrument denominated, "refusal memorandum."

It has been seen that the deed of appellees to appellant, if standing alone and unaffected by the memorandum referred to or any extraneous facts, would be an absolute conveyance of the property. This is shown by its face as clearly as if it bore the expression, "this is intended as an absolute deed and not a mortgage," for it is in the form and very language of an absolute deed conveying a fee simple title to property. It is equally clear, when viewed in the light of the authorities cited, that when this deed and the "refusal memorandum" are read and considered, as they should be, as one instrument, it simply is an absolute conveyance of the property by Bloom to Goodbar & Company, without condition of defeasance, conferring upon the grantor the right to purchase it, at his option, within the time and upon the terms specified. If the intention of parties can be gleaned from the language used by them for the purpose of giving it expression, no canons of construction need be invoked to demonstrate and illustrate that these instruments, when read, taken and considered as one, show the intention of the parties was an absolute sale *in praesenti* of the property, in which the grantor is given the right, if he should elect to exercise it, to purchase the property within a given time upon terms and conditions plainly and unequivocally expressed—an option nothing more nor less, that might have been given as well, for a consideration, had he never owned the property. In view of this express intention, the burden rested upon the appellant to prove with clearness and certainty that the instrument was intended by the parties—not one, but both—as a mortgage. (Miller v. Yturria, supra; Hays v. Emerson, supra; Gerhard v. Tucker, supra.

Do the extraneous facts evince with clearness and certainty or, as for that, reasonable certainty, that the intention of the parties was that the deed to Goodbar & Company should be held as a security for a debt that Bloom owed appellant? If the correspondence between the parties up to the time the final agreement was reached were alone to be considered it would appear that appellant did not desire to purchase or take the land in payment or discharge of the indebtedness of the appellee, but wished to take a deed to the property to secure its payment. If then, the intention of Goodbar & Company, up to that time, could alone determine the character of the transaction, it might be said that the conveyance was clearly proven to be a mortgage. But it is a homely adage that "it takes two to make a trade." In order to do this there must be a drawing together of the minds, a meeting and concurrence of them in the same intention. If the intention existing in one mind is different from that existing in the other, such diverse intentions can never, as long as they exist, meet in agreement and form a contract. It is just as apparent from the correspondence that Bloom did not desire to convey the property in question, or any of his property, as security for the debt he owed appellant as it is that the latter desired him to do so. There

is nothing tending to show a concurrence of intentions by the parties, until November the 16th, when Bloom wrote Goodbar & Company that he would comply with its letter of the 10th. The letter he refers to, as is seen, submits two propositions—one if accepted and acted upon would be tantamount to a mortgage; the other, an absolute sale, with the right given Bloom to repurchase. Let it be assumed *pro hac vice* that it was the first that Bloom had in mind when he wrote that he would comply with appellant's letter, yet it appears from the letter of instruction of November 21, 1903, written by Goodbar & Company to Mr. Newsom, and from another of the same date to appellee, in regard to drawing up papers, that the agreement reached by the parties was, with some minor modifications, just as it is expressed in the papers drawn by said attorney. There was no fraud nor mistake, save as to the failure to include two other lots in the deed, alleged or claimed by the appellant. The appellee makes no such claim, but insists the papers express the agreement. They were drawn by appellant's own attorney, from data which it furnished him for that purpose, and before signed and delivered submitted to appellant for inspection and approval; it interposed no objection, save that the instrument did not state that it was a corporation, but sent the deed back to their attorney for the appellee and his wife to execute and acknowledge; when executed and acknowledged they accepted it and executed the memorandum giving the appellee the right to repurchase. Up to the time the deed was executed, appellee's indebtedness was $1,800; of this indebtedness only $800 remains when the deed is executed for which a note with interest was taken; for this note, it is not and never was contended that the deed was intended as security; the deed nor memorandum says nothing about indebtedness, or security for indebtedness, but expresses a cash consideration of $1,000; no cash was paid. Can any one doubt that this expressed consideration was for that much of the indebtedness as it existed prior to the execution of the deed? or that $1,000 of the indebtedness ceased to exist, having been extinguished by becoming the purchase money? If so, let him consider the action of the parties in regard to the matter afterwards. For it is a rule that if one of two constructions can be placed upon a contract and it has been construed by the parties to it, it will be given by the courts that construction the parties have placed upon it themselves. In the letter of appellant of November 27, 1903, to Mr. Newsom, in which the deed was returned for appellee's signature, Newsom was requested "to say to Mr. Bloom, that any contract he makes for rent of the property must not extend beyond November 1, 1904, at which time his option will expire by limitation." This clearly and unequivocally shows that appellant construed the contract as an absolute sale, with an option on the part of appellee to purchase, which expired on November the first following. Appellant also instructed his agent to insure the property for it; and it was insured, in obedience to the instruction, for the company. Ordinarily the mortgagor of the property is entitled to the rents, the rents for the property, through courtesy, were collected by Bloom and paid to appellant and received by it as its own, without being credited on any debt. On October 12, when Bloom wrote the appellant that he had remitted the money in payment of the note made for the balance of the debt and notified it that he did not wish to redeem the property,

the reply he received from Goodbar & Company, together with the letter it afterwards wrote to Mrs. Stocker, shows clearly that it regarded the hotel property as its own, which is inconsistent with the plea that the conveyance was intended as security for a debt and perfectly consistent with what the deed, in connection with the contemporaneous memorandum, shows upon its face.

So, in any light the transaction is viewed, we conclude that the evidence is sufficient to warrant the trial court in finding as a fact, that an absolute conveyance of the property, with an option to repurchase by the grantor, was the intention of the parties.

As a reformation of the deed was sought as a preliminary relief to having the instrument declared and foreclosed as a mortgage, and in no other event, and it having been determined that appellant is not entitled to the principal relief sought, it follows that it is not entitled to the ancillary relief of reformation in this action.

The judgment is affirmed.

*Affirmed.*